CLAY, Circuit Judge,
dissenting.
Plaintiffs and Defendants dispute the meaning of the guaranty agreement (“Guaranty”), each asserting a different interpretation of the contract’s language. Both parties ask this Court to interpret the Guaranty, find that the language is clear and unambiguous, and conclude that their proposed interpretation governs. The majority concludes that the Guaranty’s language is unambiguous and that Defendants’ asserted interpretation is the only plausible reading of this language. At this stage of the proceedings, where this Court must “construe the complaint in the light most favorable to ... [P]laintiff[s and] accept all of the complaint’s factual allegations as true,” I cannot agree -with the majority that “[P]laintiff[s] undoubtedly can prove no set of facts in support of the claims that would entitle relief.” Grindstaff v. Green, 133 F.3d 416, 421 (6th Cir.1998). Indeed, the majority is only able to uphold the district court’s ruling by uncritically construing all disputed issues in Defendants’ favor. Because I disagree with the majority’s characterization of the Guaranty’s language, I respectfully dissent.
I. The Ambiguity of the Guaranty’s Language
The parties agree that under the Guaranty as originally drafted, Defendants are not obligated to pay the remaining debts. The conditions triggering the payment obligation under the limitations provision in paragraph 3 never occurred. Therefore, as the majority properly sets forth, the issue for this Court is not whether conditions occurred, but whether Plaintiffs had a right under the Guaranty to unilaterally modify the terms of the “Funding Obligations” to eliminate reference in paragraph 2 to the limitations contained in paragraph 3. Plaintiffs claim that their October 2012 letter only modified the terms of Defendants’ “Funding Obligations” in the Guaranty, which is allowed by paragraph 8, not the terms of the Guaranty itself. On the other hand, Defendants assert, and the district court and majority agree, that Plaintiffs unilaterally modified *555 the terms of the Guaranty, which is clearly prohibited by paragraph 10.
As the majority properly sets forth, guaranties are construed as ordinary contracts. 31800 Wick Road Holdings, LLC v. Future Lodging-Airport, Inc., 848 F.Supp.2d 757, 763 (E.D.Mich.2012). Therefore, this Court applies rales of contract construction from Michigan law to interpret the Guaranty. “A court’s primary responsibility in construing a Michigan contract is to ascertain and enforce the intent of the parties.” Wonderland Shopping Ctr. Venture Ltd. P’ship v. CDC Mortg. Capital, Inc., 274 F.3d 1085, 1092 (6th Cir.2001). A court accomplishes this task by first looking to the language of the contract, which is “given its ordinary and plain meaning, rather than a technical or strained construction.” Comerica Bank v. Lexington Ins. Co., 3 F.3d 939, 943-44 (6th Cir.1993). See also Pierson Sand & Gravel, Inc. v. Pierson Twp., 851 F.Supp. 850, 858 (W.D.Mich.1994) (internal citation omitted) (“As a general rale under Michigan law, contract language is interpreted according to its ordinary meaning. That is, the parties’ intent is deemed to have been consistent with the ordinary meaning of the plain and unambiguous terms they chose to express their agreement.”).
This Court gathers the intent of the parties “from the entire instrument and not from detached portions. A contract cannot be disjointed or particular parts separated from the balance, as it is necessary to consider all ... provisions of a contract ... to determine the meaning of any particular part as well as the meaning of the whole document.” Florida Canada Corp. v. Union Carbide & Carbon Corp., 280 F.2d 193, 195-96 (6th Cir.1960). See also Datron, Inc. v. CRA Holdings, Inc., 42 F.Supp.2d 736, 742 (W.D.Mich.1999) (in-temal quotation marks omitted) (“To determine the parties’ intent, the contract must be read as a whole, and all its clauses must be considered together to determine if and to what extent one may modify, explain or limit another.”).
When a contract is unambiguous, a court must enforce its terms as written. In such an instance, where the terms of a contract are clear, unambiguous, and have a definite meaning, a court may not look to extrinsic evidence to determine the intent of the parties. Sault Ste. Marie Tribe of Chippewa Indians v. Engler, 146 F.3d 367, 373 (6th Cir.1998); Michigan Chandelier Co. v. Morse, 297 Mich. 41, 297 N.W. 64, 67 (1941). However, a court finds ambiguity in a contract if “its words may reasonably be understood in different ways.” Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 544 (6th Cir.2007) (internal quotation marks omitted). “Michigan permits the use of extrinsic evidence to dispose of a potential ambiguity, to prove the existence of a potential ambiguity, or to indicate the actual intent of the parties where an actual ambiguity exists.” Wonderland Shopping Ctr., 274 F.3d at 1095.
The district court and majority improperly conclude that the intent of the parties is clear and the language of the Guaranty is unambiguous. Although the language of paragraph 10 of the Guaranty clearly precludes the unilateral waiver, consent, modification, or change of the Guaranty’s terms, that language may not be read in isolation. “Courts ‘cannot simply ignore portions of a contract in order to avoid a finding of ambiguity....’” Tenke Corp., 511 F.3d at 544 (quoting Klapp v. United Ins. Grp. Agency, Inc., 468 Mich. 459, 663 N.W.2d 447, 453 (2003)). Paragraph 8 of the same Guaranty provides that Monroe[1] *556 may “modify the terms of any Funding Obligations ... without notice to the Sault Tribe and the Authority and without affecting in any manner the unconditional obligation of the Sault Tribe and the Authority under this Guaranty Agreement.” (R. 18-2, Guaranty, at 432.)[2] The language of these two paragraphs is inherently contradictory. One paragraph clearly prohibits unilateral modification of the terms of the Guaranty, while the other paragraph expressly allows modification of the terms of any “Funding Obligations” ■without notice to the other party. This contract language is reasonably susceptible of two different meanings, and the extent of the right contained in paragraph 8 is unclear and ambiguous.
The district court’s strained interpretation attempted to read clarity into this inherently unclear document by finding that the term “Funding Obligations” means “Subscription Amount” or “underlying indebtedness.” Such an interpretation would preclude Plaintiffs under paragraphs 8 and 10 from modifying the terms of paragraph 2. The court based this conclusion on two factors. First, the district court and the majority opinion compared the Guaranty’s language to the nearly identical language of a standard Michigan UCC Form that relates to the waiver of rights with respect to payment of an underlying indebtedness. The language of the UCC Form states as follows:
Debtor waives notice of acceptance of this Agreement and presentment, demand, protest, notice of protest, dishon- or, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Indebtedness, any and all other notices to which the undersigned might otherwise be entitled, and diligence in collecting any Indebtedness, and agree(s) that the Bank may, once or any number of times, modify the terms of any Indebtedness, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Indebtedness, or permit Borrower to incur additional Indebtedness, all without notice to Debtor and without affecting in any manner the unconditional obligation of Debtor under this Agreement. 4 Mich. UCC Forms Annotated Form 9:1010 (3d ed.). The district court and the majority conclude that the parties in the instant case merely substituted “Funding Obligations” for the term “Indebtedness” in order to “satisfy Michigan law,” Maj. Op. at 552, without changing the Form’s underlying meaning.
Although this language is standard in Michigan contracts, it is not clear from the whole of the Guaranty that the modification of that provision was simply pro for-ma in nature. Paragraph 2 appears to define Funding Obligation as something much broader than the Subscription Amount. Had the parties substituted “Subscription Amount” for the term “Indebtedness,” perhaps this Court could more easily resolve this dispute. However, the parties’ intent as to choice of language cannot be divined simply by reference to the Michigan UCC Form.
Second, the district court relied on language in paragraph 6, which twice refers to the payment of “Funding Obligations.” Based on that language, the district court found that “Funding Obligations” means the “Subscription Amount” or the underlying indebtedness. In coming to this conclusion, the district court again ignored the ambiguity in the language of the Guaranty *557 and the contradictions between its provisions, favoring Defendants’ reading of the contract over Plaintiffs’ proposed reading.
The district court’s interpretation ignores the precise language of paragraph 2, while Plaintiffs’ proposed reading is consistent with its plain meaning. Once again, paragraph 2 states as follows:
Subject to the limitations, terms and conditions set forth in this Guaranty-Agreement, the Sault Tribe and the Authority, for value received, jointly and severally, unconditionally and absolutely guaranty to fund the Subscription Amount, as and when due from the Subscriber under the Subscription Agreement, upon an event of default by the Subscriber in making payment of the Subscription Amount, as and when due, and receipt by the Guarantors of notice and demand from Monroe (the “Funding Obligations ”).
(R.18-2, Guaranty, at 430.) This language makes clear that “Funding Obligations” and “Subscription Amount” are not to be used interchangeably, and “Funding Obligations” are much broader than a mere amount of money owed under the contract. There are two plausible meanings of “Funding Obligations,” one that encapsulates a broad duty to pay, and one that simply means the underlying indebtedness owed to Plaintiffs. Under the first of these possible meanings, Plaintiffs’ proposed modification of the “Funding Obligations” contained in paragraph 2 is an entirely plausible interpretation, which is not clearly precluded by paragraphs 8 and 10.
The district court found that even if there was ambiguity in the language of “Funding Obligations,” that ambiguity could be resolved by reference to basic rules of contract construction, which require that every word in a contract be given meaning, “all its parts are to be harmonized so far as reasonably possible,” “and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument.” Associated Truck Lines, Inc. v. Baer, 346 Mich. 106, 77 N.W.2d 384, 386 (1956) (internal quotation marks omitted). The district court found that Plaintiffs’ interpretation of paragraph 8 would render the limitations provision in paragraph 3 a nullity, leading to an absurd result. The majority agrees, especially as to paragraph 10, stating that “Plaintiffs’ interpretation of paragraph 8 would lead to an absurd result” because “paragraph 10, requiring the consent of the parties in writing for any contract modification, would be read out of the contract.” Maj. Op. at 553.
While it is true that parts of a contract must be read to harmonize the whole and the contract should be construed to give each subpart meaning, it is not clear from the language of the Guaranty that the parties themselves intended to embrace the district court and majority’s interpretation. The district court found that
[t]he parties negotiated an important limitation on the Tribe’s guaranty obligation tied to the amount of distributions the Tribe received from the Greektown Casino. It was never contemplated that the Tribe would be liable to the Gatzaros [sic] if the Distributions never reached the agreed upon levels spelled out in Paragraph 3.... It would be an absurd result to permit the Gatza-ros [sic] to simply eliminate by fiat this important, bargained for limitation.
(R. 20, Op. and Order, at 778-79.) Although that may be one way of viewing the intent of the parties, an equally plausible view is that paragraph 8 was an important, bargained-for right to unilaterally modify the Funding Obligations. The contracts in this case involved large deals and large *558 amounts of money, and the Guaranty was meant to protect Plaintiffs’ assets. At this stage in the proceedings, where a court is to “construe the complaint in the light most favorable to the plaintiff [and] accept all of the complaint’s factual allegations as true,” Grindstaff, 133 F.3d at 421, the majority and the district court have gone too far in attempting to divine the intent of the parties without a sufficient evidentiary basis.
Plaintiffs have articulated a plausible interpretation of this contract, and although the district court and majority contend that such an interpretation leads to an absurd result, it is not clear that the contract was not meant to yield such a result. The district court and the majority may not resolve the lack of clarity in the language of paragraph 2 and the contradiction between paragraphs 8 and 10 by reading new meaning into a contract that plausibly reflects the parties’ intent. Rather, the proper way to resolve the ambiguity in this contract is to remand the case and give the parties an opportunity to establish their intent through extrinsic evidence.
II. The Extent of Waiver of Defenses
Plaintiffs’ second argument alleges that regardless of the reading we choose to adopt, Defendants should be precluded from asserting any defenses under contract law because they waived all of those defenses by signing the Guaranty. Plaintiffs claim that the second paragraph of the “Waivers” provision contained in the Guaranty extends to all defenses, including those under basic Michigan contract law. On the other hand, Defendants assert that the “Waivers” provision includes only sure-tyship and guaranty defenses and does not reach all contract defenses.
The full “Waivers” provision states as follows:
The Sault Tribe and the Authority waive any right to require Monroe to: (a) proceed against any person or property; (b) give notice of the terms, time and place of any public or private sale of personal property security held from the Subscriber or any other person, or otherwise comply with the provisions of Section 9-504 of the Michigan or other applicable Uniform Commercial Code; or (c) pursue any other remedy in Monroe’s power. The Sault Tribe and the Authority waive notice of acceptance of this Guaranty Agreement and presentment, demand, protest, notice of protest, dishonor, notice of dishonor, notice of default, notice of intent to accelerate or demand payment of any Funding Obligations, any and all other notices to which the Sault Tribe and the Authority might otherwise be entitled, and diligence in collecting any Funding Obligations, and agree that Monroe may, once or any number of times, modify the terms of any Funding Obligations, compromise, extend, increase, accelerate, renew or forbear to enforce payment of any or all Funding Obligations, all without notice to the Sault Tribe and the Authority and without affecting in any manner the unconditional obligation of the Sault Tribe and the Authority under this Guaranty Agreement.
The Sault Tribe and the Authority unconditionally and irrevocably waive each and every defense and setoff of any nature which, under principles of guaranty or suretyship, would operate to impair or diminish in any way the obligation of the Sault Tribe and the Authority under this Guaranty Agreement, and acknowledge that each such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from the Sault Tribe and the Authority now or later securing this Guaranty *559 Agreement and/or the Funding Obligations, and acknowledge that as of the date of this Guaranty Agreement no such defense or setoff exists.
(R. 18-2, Guaranty, at 432-33.)
The district court concluded that Defendants only waived those defenses set forth in the Restatement Third of Suretyship and Guaranty. After reviewing each of the cases submitted by Plaintiffs as support for their argument, the court found that none were analogous to the instant case and concluded that because Plaintiffs were unable “to unearth a case that interprets waiver of defense language similar to that at issue here, ... [they] failed to support their legal contention that this waiver should extend to any defense that the Tribe may assert in this case.” (R. 20, Op. and Order, at 783.) The district court, joined by the majority, also acknowledged that waiver of typical suretyship and guaranty defenses is common, and assumed that this result was also desired by the parties in the instant case.
There is no dispute that the Guaranty’s “Waivers” provision is a valid waiver clause under which Defendants agreed to waive certain of their defenses. Instead, the dispute arises once the parties attempt to decipher the meaning of the provision’s terms. As explained above, the Guaranty is construed as a contract, and Michigan contract interpretation principles apply. Therefore, at the motion to dismiss stage, this Court must determine whether the ordinary and plain meaning of the Guaranty is clear and unambiguous such that only one interpretation of this waiver language is plausible. This Court interprets the contract as a whole, “as it is necessary to consider all of the provisions of a contract in order to determine the meaning of any particular part as well as the meaning of the whole document.” Florida Canada Corp., 280 F.2d at 195-96.
Of course, one possible reading of this language is the one provided by the majority and the district court. However, this is not the only plausible interpretation of the “Waivers” provision. Instead, when this Court examines the provision in its entirety, rather than disassociating the second paragraph from the first, it appears that the first paragraph of the provision provides a broad waiver of numerous rights and the second paragraph expands, rather than constricts, those rights. What this paragraph of the “Waivers” provision does or does not do is inescapably linked to the language contained in the first paragraph. It is problematic to elevate one of these readings over the other, especially since the meaning of “Funding Obligations” in relation to the parties’ rights under the Guaranty is so unclear. Because there is more than a single plausible interpretation of the Guaranty’s ‘Waivers” provision, extrinsic evidence would seem to be required in order to divine the intent of the parties as to their rights and responsibilities under the contract. Obviously, this conclusion is contrary to the approach followed by the majority opinion, which affirms the district court’s ruling on Defendants’ motion to dismiss without the benefit of extrinsic evidence.
Because the language of the Guaranty is ambiguous, I would reverse the decision of the district court granting Defendants’ motion to dismiss and remand the case to allow for presentation of extrinsic evidence. The pursuit of clarity would greatly benefit by so doing.

. Plaintiffs claim that as third party beneficiaries of the Guaranty, they may step into the shoes of Monroe.

. Citations to the record are accompanied by reference to Page ID numbers.